AO 91 (REV.5/85) Criminal Complaint

AUSA ERIC H. SUSSMAN (312) 353-1412
AUSA VICTORIA PETERS (312) 353-5319

# UNITED STATES DISTRICT COURT

<u>NORTHERN</u>        DISTRICT OF   <u>ILLINOIS, EASTERN DIVISION</u>

UNITED STATES OF AMERICA

DOCKETED     UNDER SEAL

DEC 1 2 2001

V.

**CRIMINAL COMPLAINT**

EARL C. BERRY, aka "Sugar"
SAIDRICK BERRY
WINSTON ROSS
EDDIE FREEMAN
BRIDGETTE MAURY
DALLAS BYERS
DONALD EARL
SHERROD MAURY
PHILIP SMITH
CARL RIDLEY
NATHAN ALEXANDER
ROBERT PARKER and
RALPH LNU, aka "Darrell Hall", aka
                    "Ravio"

F I L E D

DEC 1 1 2001

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**MAGISTRATE JUDGE NOLAN**

CASE NUMBER:

**01CR1079**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.  From at least <u>January 2000 to the present</u> in <u>Cook County</u>, in the   <u>Northern</u>   District of   <u>Illinois</u>   defendant(s) did,

knowingly and intentionally conspire with each other and others to possess with intent to distribute numerous quantities of powder cocaine and crack cocaine, Schedule II controlled substances

in violation of Title <u>21</u> United States Code, Section <u>846</u>                .

I further state that I am a <u>Special Agent with the FBI</u>  and that this complaint is based on the following facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof:   <u>X</u> Yes  ____ No

Signature of Complainant
Michael J. Culloton, Special Agent, FBI

Sworn to before me and subscribed in my presence,

<u>December 10, 2001</u>                at
Date

<u>Chicago, Illinois</u>
City and State

<u>NAN R. NOLAN, U.S. Magistrate Judge</u>
Name & Title of Judicial Officer

Signature of Judicial Officer

# AFFIDAVIT

I, Michael J. Culloton, being duly sworn on oath, depose and state as follows:

1.   I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed for approximately four years.   I am currently assigned to the Chicago Joint Task Force on Gangs of the Federal Bureau of Investigation.   As a Special Agent, I participate in investigations related to the illegal distribution of controlled substances, and I have been involved in various types of electronic surveillance and in the debriefing of defendants, witnesses, informants, and others who have knowledge of the illegal distribution and transportation of controlled substances.

2.   This affidavit is made in support of (i) a criminal complaint and applications for warrants to arrest EARL C. BERRY, also known as (aka) "SUGAR"; SAIDRICK BERRY; WINSTON ROSS; EDDIE FREEMAN; BRIDGETTE MAURY; DALLAS BYERS; DONALD EARL; SHERROD MAURY; PHILLIP SMITH; CARL RIDLEY; NATHAN ALEXANDER; ROBERT PARKER; RALPH LAST NAME UNKNOWN, aka DARRELL HALL, aka RAVIO; and (ii) applications for warrants to search 5322 South Bishop Street, Chicago, Illinois; 5317 South Laflin Street, Second floor apartment, Chicago, Illinois; and 12331 Meadow Lane, Blue Island, Illinois.

3.   I have participated in the FBI's investigation of the individuals identified above, and others, as part of the

1

investigation of a powder cocaine and cocaine base (crack cocaine) trafficking conspiracy described below involving members of the BLACK P STONE STREET GANG. The information contained in this affidavit is based upon that participation and includes: surveillance on various occasions; interviews of witnesses; review of recordings of consensually monitored conversations and conversations recorded pursuant to a Court authorized Title III; interviews of other law enforcement officers or reviews of their reports. This affidavit is being submitted for the limited purpose of establishing probable cause to arrest the individuals identified above and to search 5322 South Bishop Street, Chicago, Illinois; 5317 South Laflin Street, Second floor apartment, Chicago, Illinois; and 12331 Meadow Lane, Blue Island, Illinois. Accordingly, I have not included each and every fact know to law enforcement officers concerning this investigation. Similarly, all times included in this affidavit are approximate times only.

4. On the basis of the information, which I reviewed and determined to be reliable, I submit the facts contained in this affidavit are sufficient to establish probable cause to believe that from in or about January 2000 to the present, EARL C. BERRY, aka "SUGAR"; SAIDRICK BERRY; WINSTON ROSS; EDDIE FREEMAN; BRIDGETTE MAURY; DALLAS BYERS; DONALD EARL; SHERROD MAURY; PHILLIP SMITH; CARL RIDLEY; NATHAN ALEXANDER; ROBERT PARKER; RALPH LAST NAME UNKNOWN, aka DARRELL HALL, aka RAVIO, knowingly and intentionally conspired with each other and with others to possess with intent to distribute powder cocaine and "crack

2

cocaine" in violation of Title 21, United States Code, Section 841 and 846.

5.   This investigation has already revealed that members of this drug conspiracy regularly:  a) process cocaine into crack cocaine; and b) repackage cocaine and crack cocaine into amounts suitable for further distribution.  Both of these practices require the possession and use of drug paraphernalia, including scales, cutting supplies and packaging.

6.   Through my training and experience and discussions with other experienced law enforcement officers, I am familiar with the methods and operations of drug traffickers.  I know that such drug traffickers regularly keep the following items at places within their control, including their residences, for extended periods of time.  I know:

   a.   That such traffickers commonly place assets in names other than their own to avoid detection of these assets by government agencies.

   b.   That even though those assets are in other person's names, the drug dealers continue to use those assets and exercise dominion and control over them.

   c.   That large-scale drug traffickers must maintain, on hand, large amounts of United States currency in order to maintain and finance their ongoing drug business.

   d.   That drug traffickers maintain books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances, even though such documents may be in code.  That drug traffickers commonly "front" drugs (provide controlled substances on consignment) to their clients.  That the aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained

3

where the drug traffickers have ready access to them, i.e., homes, offices, and automobiles.

e.  That it is common for large-scale drug dealers to secret contraband, proceeds of drug sales, and records of drug transactions, drug sources, and drug customers, in secure locations within their residences, offices, garages, storage buildings, and safety deposit boxes for ready access, and also to conceal such items from law enforcement authorities.

f.  That persons involved in large-scale drug trafficking conceal caches of drugs, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money made from engaging in drug trafficking activities, in their residences, offices, garages, storage buildings, automobiles, and safety deposit boxes.

g.  That drug traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers for their associates in the drug trafficking organization, even if said items may be in code.

h.  That drug traffickers frequently take, or cause to be taken, photographs of themselves, their associates, their property, and their product, and that these traffickers usually maintain these photographs in their residences.

i.  That when drug traffickers amass large monetary proceeds from the sale of drugs, that the drug traffickers attempt to legitimize these profits.  I know that to accomplish these goals, drug traffickers utilize, foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, business fronts and other methods.

j.  That cocaine traffickers usually keep paraphernalia for packaging, cutting, weighing, and distributing cocaine. These paraphernalia include, but are not limited to, scales, plastic bags, and cutting agents, such as inositol or mannitol.

4

k.  That drug traffickers sometimes store documents and records relating to their drug supplies, customers, money, and assets on computer hardware and software, the contents of which frequently yield evidence of drug trafficking and money laundering crimes.

l.  That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular trafficking in controlled substances.

## Background of Investigation

7.  Since approximately June 1999, the FBI as well as agents and officers from the Chicago Police Department and other law enforcement agencies, have conducted an investigation concerning the drug trafficking and other related drug activities of the BLACK P STONE STREET GANG.

8.  The BLACK P STONE STREET GANG (BPSN) is one of the largest and most active street gangs operating in the Chicago area.  The BPSN is a violent street gang, controlled through a hierarchal system which is engaged in a myriad of criminal activities, including the possession and distribution of cocaine and cocaine base.  Investigation has determined that the primary business of the BPSN is narcotics distribution.  Members of the BPSN are actively involved in the sale of cocaine and cocaine base in and around the area of 55th and Bishop Streets in Chicago and the surrounding area.

9.  The investigation identified HUGH ARDELL ROGERS as a ranking member of the BPSN.  Multiple consensually recorded

5

telephone calls and controlled drug purchases were completed utilizing a cooperating witness associated with the BPSN and ROGERS and his associates. This investigation lead to a court authorized Title III monitoring of the telephones used by ROGERS. A separate affidavit is being filed in the United States District Court for The Northern District of Illinois for the arrest of ROGERS and his co-conspirators.

10. During the course of the ROGERS investigation, EARL BERRY was identified as the principal supplier of cocaine to ROGERS. EARL BERRY is a major supplier to members of the BPSN, ROGERS and others on the south side of Chicago. BERRY was intercepted on numerous telephone calls during the ROGERS Title III investigation. Based on those intercepted calls, informant information and other law enforcement investigation, a separate Title III investigation was initiated on EARL BERRY and his co-conspirators.

11. The EARL BERRY investigation in turn identified INDIVIDUAL A as the principal supplier of cocaine to EARL BERRY. INDIVIDAUL A was intercepted on numerous calls to BERRY during the court ordered monitoring of the telephones used by EARL BERRY. INDIVIDUAL A is also the subject of a separate Title III investigation conducted by agents of the FBI. The INDIVIDUAL A drug distribution conspiracy is being handled as a separate affidavit being filed in the Northen District of Illinois

12. This investigation has revealed the following about the roles of the defendants in the EARL C. BERRY drug trafficking

6

conspiracy:

a. EARL C. BERRY, aka "SUGAR" is a principal leader of the drug distribution operation described in this affidavit who distributes large amounts of cocaine and crack cocaine to members of the conspiracy and others. EARL C. BERRY is assisted in his drug trafficking activities by his brother SAIDRICK BERRY, aka "FREAKY", CARL RIDLEY, aka "CARLOS", and cocaine distributors, including WINSTON ROSS; EDDIE FREEMAN; BRIDGETTE MAURY; DALLAS BYERS; DONALD EARL; SHERROD MAURY; PHILLIP SMITH; NATHAN ALEXANDER; JOHN DOE, ROBERT PARKER; RALPH LAST NAME UNKNOWN, aka DARRELL HALL, aka "RAVIO". EARL BERRY'S telephone was the subject of a court authorized electronic surveillance. As a result EARL C. BERRY is referred to throughout this affidavit.

b. SAIDRICK BERRY, aka "FREAKY" assists his brother EARL BERRY in distributing large amounts of cocaine and crack cocaine to members of the conspiracy and others. SAIDRICK BERRY often sells cocaine from his second floor apartment at 5317 South Laflin, Chicago, Illinois. SAIDRICK BERRY is referred to in paragraphs 15, 18, 19, 20-22, 37, 50, and 80 of this affidavit.

c. WINSTON ROSS, EDDIE FREEMAN, BRIDGETTE MAURY, SHERROD MAURY, PHILLIP SMITH, NATHAN ALEXANDER, ROBERT PARKER, are distributors of cocaine. BERRY supplies large quantities of cocaine to these subjects. WINSTON ROSS is referred to in paragraphs 30-35 of this affidavit. EDDIE FREEMAN is referred to in paragraphs 36-40 of this affidavit. BRIDGETTE MAURY is a

7

distributor of cocaine and is assisted by her husband SHERROD
MAURY.   BRIDGETTE MAURY is referred to in paragraphs 41-46 of
this affidavit and SHERROD MAURY is referred to in paragraphs 41
and 58-61 of this affidavit.   PHILLIP SMITH is referred to in
paragraphs 61-66 of this affidavit.   NATHAN ALEXANDER is referred
to in paragraphs 47-53 of this affidavit. ROBERT PARKER is
referred to in paragraphs 80-83 of this affidavit.

    d.   DALLAS BYERS, DONALD EARL, RALPH LAST NAME UNKNOWN,
aka DARRELL HALL, aka RAVIO and CARL RIDLEY, assist BERRY in the
distribution of cocaine and have been used by BERRY as couriers
of narcotics in addition to being supplied wholesale quantities
of cocaine by EARL BERRY.   DALLAS BYERS is referred to in
paragraphs 54-57 of this affidavit.   DONALD EARL is referred to
in paragraphs 75-79 of this affidavit. RALPH LNU is referred to
in paragraphs 84-89 of this affidavit and CARL RIDLEY is referred
to in paragraphs 16 and 67-74 of this affidavit.

    13.   This investigation has involved three court-authorized
interceptions of cellular telephones used by EARL C. BERRY.   The
relevant orders obtained are as follows:

    a. On May 31, 2001,   Chief Judge Marvin A. Aspen of the
Northern District of Illinois signed an order authorizing the
interception of the wire communications occurring to and from
cellular telephone number 773-617-9573, **Target Phone One**, used by
EARL C. BERRY and subscribed to PRINCESS LOMAX, 11442 Meadow
Lane, Blue Island Illinois, Interception began shortly after the
order was signed.

b.   On June 29, 2001, Chief Judge Marvin A. Aspen
signed and order authorizing the continued interception of **Target
Phone  One**.   Interception began later that same day and continued
until July 29, 2001.

c.   On July 24, 2001, Chief Judge Marvin Aspen signed
an order authorizing the interception of wire communications to
and from telephone number 773-617-9340, **Target Phone Two**, used by
EARL C. BERRY and subscribed to PRINCESS LOMAX, 1244 Meadow Lane,
Blue Island, Illinois. Interception on **Target Phone Two** began on
the day the order was signed and continued until August 6, 2001.

### Information from Cooperating Witnesses 1

14.   Cooperating Witness One (CW-1) has been cooperating
with the FBI since November 2000, and was interviewed on numerous
occasions by members of the FBI.  CW 1 was the subject of an
investigation which resulted in three purchases of crack from
him/her.  In November 2000 he/she was approached by Agents of the
FBI and agreed to cooperate with the FBI in consideration for a
downward departure motion when he/she is sentenced.  CW-1 has
provided timely and reliable information concerning the BPSN
street gang.  The information provided by CW-1 about the BPSN
street gang is based upon either CW-1's personal knowledge or
upon conversations with gang members and others with personal
knowledge of the events discussed.  A substantial portion of CW-
1's information has been corroborated by independent

9

investigation that includes physical surveillance, interviews of members of the BPSN, telephone record analysis, review of law enforcement reports concerning the BPSN, CW-1's participation in several consensually monitored conversations with HUGH ROGERS, and three controlled drug purchases executed by the FBI with HUGH ROGERS. Information provided by CW-1 was used in the affidavits filed in United States District Court to conduct Title III interceptions of the telephones used by HUGH ARDELL ROGERS and EARL C. BERRY.

15. On January 9, 2001, CW-1 advised that EARL C. BERRY, aka SUGAR was supplying ROGERS with cocaine. CW-1 said "SUGAR" lives in the area of 53rd Street and Bishop Avenue, Chicago, Illinois, and has a younger brother SAIDRICK BERRY, aka "FREAKY", who deals narcotics with SUGAR.

16. On January 24, 2001, CW-1 said he/she was present with ROGERS when ROGERS purchased cocaine from SUGAR on at least three occasions. On these occasions, SUGAR, through a courier identified as CARL RIDLEY, aka CARLOS, delivered approximately one to one and one half kilograms of powder cocaine to ROGERS in an apartment located in the vicinity of 53rd Street and Damen Avenue. CW-1 advised ROGERS paid approximately $21,000 per kilogram.

17. On February 2, 2001, CW-1 stated he/she was present with ROGERS last summer when SUGAR supplied ROGERS with cocaine.

10

CW-1 further advised he/she believed that SUGAR is still supplying ROGERS with cocaine.

### Information Provided by Cooperating Witness 2

18.   Cooperating Witness Two (CW-2) began cooperating with the FBI on June 15, 2001.  CW-2 was arrested by Agents of the FBI for possession of cocaine on June 14, 2001, in an unrelated investigation.  CW-2 has a criminal record which includes two prior convictions for possession of a controlled substance and agreed to cooperate with the FBI with the expectation that he will receive a lesser sentence in connection with any charges against him arising from the June 14, 2001 incident.  CW-2 has provided reliable information concerning the BPSN street gang and other gangs operating in the Englewood area of Chicago's south side.  The information provided by CW-2 about the BPSN street gang is based upon either CW-2's personal knowledge or upon conversations with gang members and others with personal knowledge of the events discussed.  A portion of CW-2's information has been corroborated by independent investigation that includes physical surveillance, interviews of members of the BPSN, telephone record analysis, review of law enforcement reports concerning the BPSN, CW-2's participation in consensually monitored conversations with SAIDRICK BERRY, and two controlled drug purchases executed by the FBI with SAIDRICK BERRY.

11

19. On June 15, 2001, CW-2 identified a photograph of EARL BERRY, aka SUGAR. CW-2 advised that he/she knows BERRY as a supplier of cocaine in the area of 53rd and Bishop Street in Chicago. CW-2 advised that he/she purchased cocaine from BERRY in 1989 but since that time BERRY began to deal in larger quantities of cocaine, more than CW-2 would regularly purchase. CW-2 advised that he/she could purchase cocaine from SAIDRICK BERRY who works for his brother EARL BERRY selling cocaine. CW-2 provided SAIDRICK BERRY'S phone number 773-617-9584, which is subscribed to PRINCESS LOMAX, 12331 Meadow Lane, Apartment 3, Blue Island, Illinois.

**Two Controlled Purchases of Cocaine from SAIDRICK BERRY to CW2**

20. On July 5, 2001, at approximately 5:48 p.m. CW-2 placed a consensually recorded telephone call to SAIDRICK BERRY at 773-617-9584. SAIDRICK BERRY asked CW-2 if he/she wanted the same thing and stated he was on the way to his "crib" and would meet CW-2 there. CW-2 advised that SAIDRICK was referring to CW-2 purchasing one ounce of cocaine and he would meet him/her at his house at 5322 South Bishop Street. At approximately 6:20 p.m., CW-2 met SAIDRICK BERRY at 5322 South Bishop Street. SAIDRICK told CW-2 that he did not have it "soft" but he had it "hard." SAIDRICK said he could get some "soft" in about an hour. CW-2 understood SAIDRICK to mean that he did not have one ounce of

12

powder cocaine or "soft" but he had it "hard", meaning crack cocaine. SAIDRICK could get the powder cocaine if CW-2 wanted it. CW-2 asked SAIDRICK how much the "hard" would be, SAIDRICK replied $700. CW-2 told SAIDRICK he/she would take that. CW-2 then followed SAIDRICK to 5317 South Laflin street, second floor apartment, where SAIDRICK sold him the ounce of "crack" cocaine.

21. The drugs purchased by CW-2 on July 5, 2001 were submitted for analysis to the Drug Enforcement Administration (DEA) Lab, and tested positive for cocaine base. DEA analysis revealed 27.8 grams of 39% pure cocaine base.

22. On July 23, 2001, at approximately 4:35 p.m. CW-2 placed a consensually monitored telephone call to SAIDRICK BERRY. CW2 asked SAIDRICK BERRY for the "same demo as last time." SAIDRICK replied that he was at the apartment on Laflin and CW-2 could come by. CW-2 stated that he understood this to mean that SAIDRICK BERRY was going to sell him the same amount of cocaine that he bought the last time. At approximately 5:32 p.m. CW-2 went to the apartment at 5317 S. Laflin, Chicago, and met SAIDRICK BERRY in the upstairs apartment. CW-2 stated that SAIDRICK BERRY went into the back of the apartment and came out with one ounce of "crack" cocaine. CW-2 gave SAIDRICK BERRY $700.00 and left the apartment.

23. The drugs purchased by CW-2 on July 23, 2001, were submitted for analysis to the DEA Lab, and tested positive for

13

cocaine base.    DEA analysis revealed 22.9 grams of 44% pure

cocaine base.

### Intercepted Conversations

24.    As stated above, the FBI intercepted calls to and from

telephones utilized by EARL BERRY from June 23, 2001 until August

23, 2001, pursuant to Court Orders.    The intercepted

conversations included numerous conversations establishing the

involvement of members of the EARL BERRY drug distribution

operation in the conspiracy charged in the complaint.

25.    Affiant's interpretations of these conversations are

based on Affiant's knowledge of the investigation to date, the

context of the conversations, both prior and subsequent

conversations, Affiant's experience in gang and narcotics related

investigations and conversations with other officers and agents

experienced in narcotics related investigations.

### Five Kilograms of Cocaine seized from EARL C. BERRY on July 30, 2001

26.    On July 30, 2001, at approximately 8:40 a.m. (Call

#846) EARL BERRY placed a telephone call to INDIVIDUAL A and had

a conversation in which they agreed to meet to switch cars.

BERRY asked INDIVIDUAL A if he had "those five fishing rods"

(believed to be code for five kilograms of cocaine) and

INDIVIDUAL A replied he did but he was not set yet because he

needed his car.  (Affiant believes that BERRY and INDIVIDUAL A

14

utilize cars with hidden compartments or "Trap" cars to conduct
their transactions and INDIVIDUAL A needed one of those cars from
BERRY to complete this deal.) BERRY and INDIVIDUAL A agreed to
meet at approximately 9:30 a.m. At approximately 9:20 a.m.
surveillance observed EARL BERRY in Sherman Park, seated in a
brown Buick LeSabre, Illinois license Y343404, which is
registered to INDIVIDUAL A. At approximately 9:35 a.m.
INDIVIDUAL A was observed parking behind the brown Buick then
getting into the car with EARL BERRY. Afer meeting with BERRY,
INDIVIDUAL A took the Buick and left the park. BERRY was picked
up by an unknown subject driving a white Monte Carlo, Illinois
registration T766025.

27. At approximately 12:29 p.m. (Call #848) INDIVIDUAL A
called EARL BERRY and told him he was waiting. BERRY told
INDIVIDUAL A he would be there in twenty minutes. At
approximately 1:03 p.m. the brown Buick was observed entering
Sherman Park by FBI surveillance units. INDIVIDUAL A and another
Hispanic male were observed waiting by the car. At 1:09 p.m.
EARL BERRY met with INDIVIDUAL A at the park and exchanged
vehicles. BERRY drove the brown Buick from Sherman Park
southbound on Throop Street from Garfield Boulevard.
Surveillance agents and officers from Chicago Police Department
(CPD) conducted a stop on BERRY. A search of the vehicle located
a hidden compartment or "trap" behind the rear seat. Located
inside the trap were five kilograms of cocaine. The cocaine was
seized and inventoried as evidence.

15

28. The cocaine seized from the trap in the brown Buick was submitted to the DEA Lab for analysis and tested positive for cocaine base. DEA analysis tested three of the five packages of cocaine and revealed exhibit 4.01 contains 2020 grams of 76% pure cocaine base, exhibit 4.02 contains 1980 grams of 75% pure cocaine base and exhibit 4.03 contains 978 grams of 71% pure cocaine base.

29. Following the stop at approximately 7:12 p.m. (Call#911) BERRY and INDIVIDUAL A had a telephone conversation in which BERRY told INDIVIDUAL A he was stopped by the police. BERRY informed INDIVIDUAL A that they got "everything" in the car. INDIVIDUAL A was concerned because the car was registered to his address where his wife and kids live and he didn't want the police to know where he lived. INDIVIDUAL A also asked BERRY when he would get his money and BERRY told him that he would be back in town Monday. Based on my training and experience, and in the context of the investigation, I believe the cocaine or a portion of the cocaine was "fronted" or given on credit to BERRY by INDIVIDUAL A.

### WINSTON ROSS

30. In summary, WINSTON ROSS was intercepted in incriminating calls with EARL BERRY. Some of these conversations are summarized below. From these calls, it appears that WINSTON ROSS is a co-conspirator in EARL BERRY'S drug distribution network and is supplied large quantities of narcotics from EARL

16

BERRY.  WINSTON ROSS then distributes the cocaine to his network of customers.

31.  On June 4, 2001, at approximately 5:42 p.m. (Call #215) WINSTON ROSS and EARL BERRY had a telephone conversation.  During the call, ROSS asked BERRY if he got "those brake pads for me." BERRY asked if he only needed one and ROSS replied that he did. BERRY stated he would be on the way out there.  Affiant understands this conversation to be code to discuss ROSS purchasing a quantity of cocaine from BERRY.

32.  At approximately 6:22 p.m. (Call #220) ROSS called BERRY and asked how far away he was. BERRY replied that he was on 79th.  At approximately 7:19 p.m. (Call #232) ROSS called BERRY and said that 79th is a long way, BERRY replied that he was on 123rd and that he had to stop and get that "whatcha call it" for ROSS, believed to be the cocaine discussed in the earlier call. BERRY said that he would be right there.  ROSS told BERRY to come to the back.  At approximately 7:40 p.m. (Call #238) BERRY called ROSS that he was at the expressway at 119th.  BERRY asked ROSS if he had the "front jacked up", because ROSS needed to take it off. At approximately 7:51 p.m., BERRY called ROSS and asked how long he should sit "back here".  Affiant believes this to mean that BERRY and ROSS were meeting to complete the sale of cocaine discussed in the above calls.

33.  On June 12, 2001, at approximately 6:07 p.m. (Call #670) ROSS left a message on BERRY's voice mail asking BERRY to

call him "If you're going shopping tomorrow man. I mean, if you know, me and you go shopping for, you know." At approximately 6:12 p.m. (Call #698) BERRY called ROSS and told him he was going out of town tomorrow morning. BERRY asked ROSS if he could "come over here and get it from SAID in the morning." ROSS asked if "On B?" and BERRY replied "My dad's house." meaning the house at 5322 South Bishop, Street, Chicago. ROSS stated he would come over early in the morning because he didn't like going to that house with a lot of people around. Affiant understands this series of conversations to mean that ROSS was arranging to purchase cocaine from BERRY at his father's house at 5322 S. Bishop. BERRY was going to be out of town so he was directing ROSS to meet with his brother SAIDRICK BERRY to pick up the cocaine.

34. On June 13, 2001, at approximately 11:44 a.m. (Call # 732) BERRY and ROSS had a telephone conversation in which ROSS told BERRY "The chick sure can swim good right." and "That short forty three years old stuff." BERRY replied "She wasn't ..that wasn't no forty three laps. It was like twenty-eight laps nigger. I already knew that." Affiant understands this conversation to be BERRY and ROSS discussing the amount and the quality of the cocaine ROSS purchased from BERRY. ROSS told BERRY the cocaine was short forty-three grams and BERRY argued that it was only short twenty-eight grams .

35. On June 15, 2001, at approximately 3:13 p.m. (Call #861), INDIVIDUAL A called BERRY and said, "It's 195 short from

18

my telephone." BERRY responded, "Man, that is no problem. You ain't got to call me acting like I'm running somewhere for 190 some dollars, man." Immediately following this call BERRY called WINSTON ROSS and said, "You owe me 197 dollars, bitch." Based upon this conversation, it is my belief that ROSS had previously given BERRY a sum of money with which to purchase narcotics from INDIVIDUAL A, and that the amount of money was "short."

### EDDIE FREEMAN

36. In summary, EDDIE FREEMAN was intercepted in incriminating calls with EARL BERRY. Some of these conversations are summarized below. From these calls, it appears that EDDIE FREEMAN is a co-conspirator in EARL BERRY'S drug distribution network and is supplied large quantities of narcotics from EARL BERRY. EDDIE FREEMAN then distributes the cocaine to his network of customers.

37. On June 1, 2001, at approximately 2:02 p.m. (Call #53) EDDIE FREEMAN called BERRY and asked "what is happening." BERRY told FREEMAN that he had to call FREAKY (SAIDRICK BERRY) and he would call him right back. At approximately 2:06 p.m. (Call# 55) BERRY called FREEMAN back and told FREEMAN to go over to his dad's house right now. Affiant understands this telephone call to be BERRY arranging a purchase of narcotics at his father's house for EDDIE FREEMAN and that SAIDRICK BERRY aka "FREAKY" was assisting in the transaction.

38. On June 5, 2001, at approximately 12:09 p.m., (Call # 290) EDDIE FREEMAN left a message for BERRY, asking BERRY for the

19

"ticket" on the cigarettes.  Affiant believes FREEMAN is asking about the price of narcotics.  At approximately 12:11 p.m., (Call #292) BERRY placed a call to FREEMAN who asked what the "ticket was on that."  BERRY then asked "You got that what'ch ya call it press, right?" FREEMAN answered "Right."  BERRY asked if FREEMAN had ordered "the two shirts for six dollars", believed to be code for a quantity of cocaine for $6,000.00.  FREEMAN stated that he had some people coming and he wanted to get a "ticket" because he "hardly had any left to let the people try it and see how it is." BERRY said he would not be back until Thursday and FREEMAN replied that he will be talking to BERRY in a couple of days. Affiant understands this to mean that BERRY and FREEMAN were arranging a deal for cocaine.

39.  On June 12, 2001, at approximately 6:12 p.m. (Call #699)  EDDIE FREEMAN called EARL BERRY and had a conversation in which FREEMAN told BERRY he was trying "to get with you" and he was "Holding on cause it get kinda slow.  I got off about a quarter but then it slowed down." believed to be a quarter kilogram of cocaine.  BERRY then told FREEMAN that he was leaving and would not be back until the morning.   FREEMAN stated he would call him then.  Affiant believes this conversation was FREEMAN discussing the purchase of cocaine from BERRY.

40.  On June 19, 2001, at approximately 4:07 p.m. (Call #1059) FREEMAN left a message for BERRY saying "I tried to get up

20

with you yesterday. Cause I want you to bring me some cigarettes back if they are available. Give me a call." Affiant believes this is code for FREEMAN requesting narcotics from BERRY.

## BRIDGETTE MAURY

41. In summary BRIDGETTE MAURY, was intercepted in incriminating calls with EARL BERRY. Some of these conversations are summarized below. From these calls, it appears that BRIDGETTE MAURY is a co-conspirator in EARL BERRY'S drug distribution network and is supplied large quantities of narcotics from EARL BERRY. BRIDGETTE MAURY is assisted by SHERROD MAURY and distributes the cocaine to their network of customers.

42. On June 7, 2001, at approximately 3:03 p.m. (Call #451) a conversation was intercepted between BERRY and BRIDGETTE MAURY. MAURY told BERRY that her "money was short". BERRY asked MAURY "what happened" and your "thing was wrong". BERRY stated that when he "cashed that check" he gave MAURY "five hundred dollars", believed to be 500 grams of cocaine. MAURY replied that she "cashed one hundred twenty-five dollars," believed to be 125 grams of cocaine. BERRY stated that MAURY must be doing something wrong and that he just gave "dude" the rest of that money and the guy wanted to borrow some more money, but BERRY did not have any more, (believed to mean cocaine). Affiant understands this to mean that BERRY is telling MAURY that he just

21

gave the rest of the cocaine away and he did not have any more.
MAURY stated that she did not want to go to the store and try it
again. BERRY stated that there was nothing wrong with it,
meaning the cocaine. MAURY then told BERRY that it was twenty-
nine dollars under, BERRY replied that MAURY must have done
something wrong, BERRY told MAURY to bring it back and MAURY
agreed. Affiant believes that MAURY was having trouble cooking
the cocaine into "crack" and the weight after cooking the cocaine
was not correct.

43. At approximately 3:11 p.m.,(Call #456) BERRY and
BRIDGETTE MAURY had a conversation in which MAURY told BERRY that
"we gonna be fair about this". MAURY told BERRY that she had
been to the store for more "washing powder," believed to mean
mixing powder used to cut the cocaine. MAURY then told BERRY
that if the "second wash come out right," that MAURY would take
responsibility for the first one. MAURY stated that she would
call BERRY if "it's all good." Affiant believes this to mean
that MAURY was going to try and cook the cocaine again and let
BERRY know if it works correctly. BERRY replied that it would
come out right. MAURY told BERRY that he should take
responsibility if it did not come out right. BERRY replied that
he "sells you some good shit" in reference to the quality of the
cocaine. MAURY said that she was not complaining about the
quality and "that all good" but she needed it, meaning the

cocaine.

44. At approximately 8:48p.m., (Call # 475) BERRY and BRIDGETTE MAURY had a telephone conversation in which BRIDGETTE told BERRY that she was going to try it again. BRIDGETTE also told BERRY that she talked to SHERROD MAURY who told her that some guys named Eddie Bell and Neal were having the same problem. BERRY told BRIDGETTE that he hasn't talked to Neal. BRIDGETTE told BERRY that she was going to try and do it again and will call him. Affiant believes that BRIDGETTE MAURY and BERRY were discussing the quality of the cocaine continuing the conversation they were having earlier.

45. At approximately 9:02 p.m., (Call #476) a telephone call was intercepted between BERRY and BRIDGETTE MAURY in which MAURY told BERRY that it was the "same thing, just not... just not the same numbers". BERRY asked MAURY is she wanted to bring it back to him, meaning return the cocaine. MAURY replied that she needed it. MAURY told BERRY that it was just too "excessive" and if was a little off she would not worry about it. MAURY told BERRY that she was picking it up off the floor and told BERRY "102." BERRY replied "see that's fucked up". MAURY said that it was "29" last time and that it was getting a little better, "yep 102". MAURY then told BERRY "it's nothing, I mean butter" believed to be in reference to the color of the cocaine. MAURY said to BERRY that there was something in the "wash of it"

and that he had to see the "formation, you gotta see the formation too." BERRY said he knew what MAURY was saying. MAURY asked BERRY to "work something" and BERRY replied that he could not do anything, because BERRY had to get what he was supposed to get. BERRY told MAURY that "dude and them ain't, that's what I'm tellin you, see they ain't have no problem." MAURY asked BERRY "what do I do." MAURY then asked BERRY "three-nine, plus twenty-three is how much?....seventy-two." BERRY responded that it was too much. BERRY told MAURY that he would try to do something for her and would call MAURY back. Affiant believes the above series of telephone calls related to MAURY discussing the cooking of cocaine with BERRY. Affiant believes MAURY was talking with BERRY about the weight not being correct after cooking the cocaine.

46. On June 21, 2001, at approximately 1:50 p.m. (Call #1129) BRIDGETTE MAURY and EARL BERRY had a telephone conversation in which MAURY told BERRY that she was trying to call him but he wasn't calling back. BERRY said his phone wasn't working right and "I got it right now and I got it for you, but I'm leaving." MAURY stated she was on the way there and asked BERRY to "put a dollar twenty-five...put a dollar twenty five cents with that phone." BERRY said alright. Affiant understands this to mean that MAURY was meeting BERRY to purchase one hundred twenty-five grams of cocaine or one eighth of a kilogram.

## NATHAN ALEXANDER

47.   In summary, NATHAN ALEXANDER was intercepted in incriminating calls with EARL BERRY.  Some of these conversations are summarized below.  From these calls, it appears that NATHAN ALEXANDER is a co-conspirator in EARL BERRY'S drug distribution network and is supplied large quantities of narcotics from EARL BERRY and is occasionally fronted cocaine by BERRY.  NATHAN ALEXANDER then distributes the cocaine to his network of customers.

48.   On June 3, 2001, at approximately 1:27 p.m. (Call #129) a telephone call between NATHAN ALEXANDER and EARL BERRY was intercepted in which ALEXANDER asked BERRY where "SAID" or SAIDRICK BERRY was, BERRY replied that "SAID" was at home. ALEXANDER told BERRY that the lady wears a "size nine dress, she is a big motherfucker", believed to mean nine ounces of cocaine. BERRY asked ALEXANDER if he wanted the black one and stated that the black ones are gone until Monday.  BERRY told the ALEXANDER that he had some sky blue ones and ALEXANDER asked how much. BERRY told ALEXANDER that BERRY has some rhinestone ones with "long sleeves" that come to your elbow for fifty-five dollars. Affiant believes this to mean ALEXANDER and BERRY are talking about the sale of nine ounces cocaine for fifty-five hundred dollars.  Affiant believes that the terms "black ones", "sky blue ones", and "rhinestone ones" are references to cocaine.

49.   On June 9, 2001, at approximately 12:00 p.m. (Call

25

#527) ALEXANDER and BERRY had a conversation in which ALEXANDER called BERRY "SUGAR". ALEXANDER asked BERRY if had any nice "sweaters" for him and BERRY replied that he did. ALEXANDER asked BERRY "what they startin at?" BERRY stated that he had short sleeve, ALEXANDER asked "how much?". BERRY asked ALEXANDER if he was talking about the ones "without the new collar", and ALEXANDER replied yes. BERRY stated that they were "28 dollars". ALEXANDER responded that BERRY told him a different price the other day. BERRY asked ALEXANDER what price he gave ALEXANDER the other day and ALEXANDER said "26 dollars". BERRY stated that he never told ALEXANDER that price. ALEXANDER stated that "PLUTO" told him that price. BERRY said that "Pluto" was lying. ALEXANDER stated that he would call BERRY back, BERRY responded that ALEXANDER had better hurry up "cause dude want to try the yellow one on". Affiant understands this call to mean that BERRY and ALEXANDER are discussing the purchase price for a quantity of cocaine in code and BERRY wants to charge $28,000.00 for the cocaine.

50. On June 10, 2001, at approximately 6:08 p.m. (Call #577) BERRY and ALEXANDER had a telephone conversation in which ALEXANDER asked BERRY how he was doing and BERRY he was replied that he was "straight". ALEXANDER asked BERRY if he had "my sweater for me" code for cocaine. BERRY told ALEXANDER that he had to "go over there." ALEXANDER responded that he did not have

26

a car. BERRY told ALEXANDER that "man, you won't get that motherfucker then". ALEXANDER stated that he wanted to get "2 though, but I got like 46" or $4,600.00. BERRY responded that you know "shit don't work like that, man". ALEXANDER then stated that "it ain't that much off" meaning not much less then the agreed upon price. BERRY asked ALEXANDER if he wanted that gray one and that brown colored one. BERRY told ALEXANDER that the gray one is a "extra-large" and the other one is a "large", BERRY then stated that "it still fit" believed to mean both are about the same weight. BERRY asked ALEXANDER when he was going to pay the difference and ALEXANDER responded "in about two days". ALEXANDER asked BERRY who he should talk to when he "gets there." BERRY said he was not there. ALEXANDER asked BERRY if he should see "SAID" believed to be SAIDRICK BERRY and BERRY responded "right, they already in plastic" believed to mean the cocaine is already wrapped in plastic. Affiant believes BERRY was directing ALEXANDER to either his father's house at 5322 South Bishop or tio SAIDRICK's house at 5317 S. Laflin and to see SAIDRICK BERRY there to purchase the cocaine they discussed.

51. At approximately 6:47 p.m. (Call #578) ALEXANDER called and asked BERRY "how, how much one suit jacket is?", BERRY responded "what". ALEXANDER then asked BERRY "how much, how much one sweater is?" at which time BERRY stated that he already had told ALEXANDER the price. ALEXANDER then told BERRY that he was

27

on the way. Affiant believes that BERRY and ALEXANDER are discussing the price for a quantity of cocaine using the code sweaters.

52. On July 26, 2001, at approximately 4:19 p.m. (Call #310) ALEXANDER Called BERRY and told him "I need a size nine shoe." BERRY responded "I'm waiting on them, some of the red and white ones." ALEXANDER respond that is what he wanted and BERRY told him he better come by. Affiant understands this conversation to mean that ALEXANDER was asking BERRY for nine ounces of cocaine ad BERRY told him he was waiting and that he should come by the house on Bishop to purchase the cocaine.

53. On July 27, 2001, at approximately 3:40 p.m.(Call #418) BERRY called ALEXANDER and asked "You still ain't got none of my money for me yet man?" ALEXANDER responded that he did not have it but asked "Them boys have any more of them gym shoes?" BERRY responded "Yeah they got some the..one red pair." ALEXANDER asked how much they were selling them for and BERRY said cheap. Affiant believes this conversation to mean that BERRY was asking ALEXANDER for money that he "fronted" ALEXANDER from a previous narcotics transaction and ALEXANDER was asking BERRY if he had any cocaine or "gym shoes" to sell.

### DALLAS BYERS

54. In summary, DALLAS BYERS was intercepted in

28

incriminating calls with EARL BERRY. Some of those conversations are summarized below. From these calls, it appears that BYERS is a co-conspirator in EARL BERRY's drug distribution network and is supplied narcotics from EARL BERRY. BYERS distributes cocaine to his network of customers. It appears that BERRY "fronts", or provides on credit, cocaine to BYERS. The following is a summary of the pertinent criminal calls involving DALLAS BYERS and EARL BERRY:

55. On June 4, 2001, at approximately 9:12 p.m. (Call #253), DALLAS BYERS called EARL BERRY and asked "hey bro, that synthetic oil..that shit was like twenty-three dollars a quart now. I got twenty bucks bro. I'm trying to get me a quart before they sell out." BERRY responded "Right I know what you are talking about" and "I'll make sure it's right for you." Affiant understands this conversation to mean that BYERS was asking to buy one kilogram of cocaine from BERRY for twenty thousand dollars when BERRY would normally sell a kilogram for twenty-three thousand.

56. On June 11, 2001, at approximately 1:36 p.m. (Call #607), DALLAS BYERS called a EARL BERRY and asked "You ready for me?" (commonly used to ask if BERRY had cocaine to sell) BERRY responded "I don't know what you are talking about dude. You said you gonna call me back and tell me and you ain't call me yet." BYERS stated it was his fault because he was waiting for someone to come up and he wanted to see how long it would take.

29

BERRY asked BYERS if "You got the little change you owe me?"
BYERS responded that he did and BERRY told him to "Bring it with
you when I call you, just come on, I got'ch ya." Affiant
understands this conversation to be BYERS arranging to purchase
cocaine from BERRY who asked BYERS for the money or change that
BYERS owes him from a previous narcotics transaction in which
BERRY fronted the narcotics to BYERS.

57. At approximately 4:23 p.m. (call #621) BYERS called
BERRY and asked if he should come around back. BERRY told him
yes and he would be there in a minutes. FBI surveillance units
observed a red pick-up truck, registered to DALLAS BYERS pull
into the alley directly behind 5322 S. Bishop, Chicago, EARL
BERRY's father's residence. The red pick-up truck stopped in the
vicinity of the garage behind 5322 S. Bishop. At approximately
9:48 p.m. BYERS had a telephone conversation in which BERRY
became angry with BYERS for not calling him and let him know he
was "Cool." BERRY told BYERS to "Just call and say man I made it
or whatever." BYERS told BERRY he is on the way to see him and
BERRY said "Alright I ain't around there, but you know, did you
put the tire back on right?" Byers told BERRY that he did and
BERRY told him to "Just park it in the lot give my dad the keys
and lock the door." BYERS asked "or you want me to just hold it
'till the morning?" BYERS told BERRY that he "rather see you"
and BERRY agrees to meet him in about forty-five minutes. During

30

the course of the investigation BERRY and his associates utilized vehicles with hidden compartments to transport narcotics. These vehicle were seen parked in the backyard at 5322 South Bishop Street. Affiant understands this conversation to be concerning BYERS using one of these vehicles to conduct an narcotics transaction. Affiant believes BYERS was used as a courier for BERRY and was instructed to call when he completed the deal. In this conversation BERRY is upset at BYERS for not calling to tell him he was "Cool" or that everything went alright with the narcotics transaction.

### SHERROD MAURY

58. In summary, SHERROD MAURY was intercepted in incriminating calls with EARL BERRY. Some of those conversations are summarized below. From these calls, it appears that BYERS is a co-conspirator in EARL BERRY's drug distribution network and is supplied narcotics from EARL BERRY. MAURY and his wife BRIDGETTE MAURY distributes cocaine to his network of customers. It appears that BERRY "fronts", or provides on credit, cocaine to SHERROD and BRIDGETTE MAURY. The following is a summary of te pertinent criminal calls involving SHERROD MAURY and EARL BERRY:

59. On June 28, 2001, at approximately 5:47 p.m. (Call # 1274) SHERROD MAURY called EARL BERRY and asked "I need a one twenty-five" meaning one hundred and twenty five ounces of

cocaine. BERRY told SHERROD MAURY he will call him back. At approximately 9:11 p.m., SHERROD MAURY and BERRY had a telephone conversation in which BERRY told MAURY "I couldn't cash that check, I got to pick it up. So can you be there in the morning no later than eleven o'clock." On June 29, 2001 at approximately 11:41 a.m. SHERROD MAURY and BERRY have a conversation in which BERRY told him he was going there and getting it right now. SHERROD MAURY then arranged to meet BERRY about two o'clock. Affiant believes that this conversation was in regards to the purchase of the one hundred twenty-five ounces of cocaine and BERRY arranging to meet SHERROD MAURY to complete the deal.

60. On June 29, 2001, at approximately 7:06 p.m. (Call #1390) A call was intercepted between SHERROD MAURY and EARL BERRY in which BERRY asked "Hey man, you gonna get me my mother fuckin' money or what?" MAURY responded "Oh, I'll get it together for you soon." Affiant understands this conversation to mean that BERRY was calling to get money owed to him by SHERROD MAURY for the drug purchase detailed above.

### PHILLIP SMITH

61. In summary, PHILLIP SMITH was intercepted in incriminating calls with EARL BERRY. Some of those conversations are summarized below. From these calls, it appears that SMITH is a co-conspirator in EARL BERRY's drug distribution network and is

supplied narcotics from EARL BERRY. SMITH in turn then distributes cocaine to his network of customers. It appears that BERRY "fronts", or provides on credit, cocaine to SMITH. The following is a summary of the pertinent criminal calls involving SMITH and EARL BERRY:

62. On June 6, 2001, at approximately 10:47 p.m. (Call # 399) PHILLIP SMITH called EARL BERRY and told him in part "Hey I'm going to do something first then I'll probably bring it..take it over there in the morning cause I probably have a little more." BERRY told SMITH he could wait until morning. On June 7, 2001 at approximately 4:56 p.m. (Call #436) BERRY and SMITH had a conversation in which SMITH told BERRY "I'm gonna...I should have something for you today. Probably half." BERRY replied "If not, I just see you Monday then." SMITH replied that Monday would be better "I have the whole thing then." Affiant believes this conversation to be concerning SMITH arranging to pay BERRY for an amount of money owed to him from a cocaine purchase in which BERRY fronted the cocaine or a portion of the cocaine.

63. On July 25, 2001, at approximately 7:37 p.m. (Call# 178) BERRY and SMITH have a conversation in which SMITH tells BERRY "I didn't like that one man. Just give me another one or something alright. That's just like the other one I didn't want. That's the same thing." (Believed to be concerning the quality of the cocaine) BERRY asked what happened to it and SMITH replied

33

"It just start bubbling up. It won't get thick." BERRY asked
SMITH "What are you talking about?" and SMITH stated " When those
shoes caught on fire and the soles start burning." BERRY replied
"Right." SMITH continued saying "That should of got thick. It
won't get thick." BERRY told SMITH that if he did what he did to
it last time he was "stuck." SMITH stated that he couldn't know
it was "a problem if he don't do it." Affiant understands this
conversation to be concerning SMITH having difficulty cooking the
cocaine purchased form BERRY into "Crack cocaine." BERRY told
SMITH that " You said I'm gonna take your and make a hundred
dollars, but you go there and take two hundred and fifty dollars
and lose. You can't keep doing that man." (Believed to be
concerning SMITH taking an amount of cocaine and adding to it or
"cutting" it to attempt to make a larger quantity) BERRY told
SMITH "Just bring it. Bring it with you because I have the shoe
strings with you and call me when you are around the way."
Affiant believes SMITH purchased cocaine from BERRY which he
tried to cook into crack cocaine unsuccessfully.

64. At approximately 7:46 p.m. on July 25, 2001, (Call
#180)SMITH called BERRY and told BERRY "This is what I'm gonna
do, alright? I'm gonna get him to buy another pair of gym shoes
and put it in with it." (Believed to mean SMITH would get his
costomer to purchase more cocaine) BERRY replied "That's all you
had to do at first." SMITH then told BERRY "If you got the

34

product and you can't do nothin' with it, you know what I'm saying? You can let me know and then I can do that, but you gotta have me some better shoes to go with it." BERRY then tells SMITH "Man I'm just saying you now you straight with me. Whatever it is you know you can refund and get your refund." SMITH told BERRY "But I'm gonna just hold that you know what I'm saying. I'm going to get me another pair of shoes today." BERRY then told SMITH "You straight, don't worry about it. I got some nice ones for you." Affiant believes this conversation was a continuation of the conversation above concerning the quality of the cocaine SMITH purchased form BERRY and SMITH making arrangements to get more cocaine to add to the amount he attempted to cook.

65. On July 27, 2001, at approximately 1:40 p.m. (Call #389) SMITH and BERRY have a telephone conversation in which SMITH asked BERRY why he didn't call him and BERRY responded that he was leaving and would be there at about four thirty. SMITH then tells BERRY "But you owe me man. You know that right?" BERRY argues with SMITH then asks him "Listen, you smooth the concrete and everything down, right?" (Believed to be code for SMITH cooking the cocaine) SMITH responded "Yeah but I had to get something else though, you know what I sayin?" BERRY and SMITH agree to talk about it when BERRY gets there. Affiant understands this to mean that SMITH was attempting to get cocaine

35

from BERRY since the last amount he purchased didn't work out when he attempted to cook it into crack cocaine.

66.   On July 27, 2001, at approximately 6:58 p.m. (Call #466) SMITH called BERRY and told him "I'm at your crib man." BERRY asked "You all good?"  SMITH replied "Yeah that was tight." BERRY stated "Alright give it to my daddy."  SMITH replied "Alright.  I'm gonna let FREAKY talk, he right here."  SAIDRICK BERRY aka FREAKY then gets on the telephone with BERRY who asked "Alright you got that?" SAIDRICK BERRY replied "Yeah" and told EARL BERRY "You need to come over here and do this."  BERRY indicated he was on his way.  Affiant understands this conversation to be SMITH delivering payment for the cocaine purchased in previous calls and that SAIDRICK BERRY was assisting EARL BERRY in the transaction.

## CARL RIDLEY

67.   In summary, CARL RIDLEY has been intercepted in conversations with EARL BERRY and INDIVIDUAL A in the court ordered interception of telephones used by INDIVIDUAL A.  Some of these calls are summarized below.  From these calls and other investigation, it is believed that CARL RIDLEY aka CARLOS assists BERRY in drug distribution operation.  RIDLEY has been intercepted in calls in which he discusses EARL BERRY business with INDIVIDUAL A.  CW-1 has been present when CARL RIDLEY

delivered cocaine on behalf of EARL BERRY.

68. On October 9, 2000, Chicago Police Officers arrested CARL RIDLEY in possession of 500 grams of cocaine in the area of 2038 West 67th Place, Chicago. In the course of their narcotics investigation CPD officers observed RIDLEY approaching the location with a black plastic bag in his hand containing the cocaine. At the time of his arrest RIDLEY had $1,780.00 in United States Currency on his person. The charges filed in the Cook County District court have not yet been adjudicated on these charges.

69. On June 27, 2001 at approximately 11:39 a.m. INDIVIDUAL A called CARL RIDLEY and told him that "SUGAR" (EARL BERRY) has not been answering his phone or returning his messages. RIDLEY responded that BERRY does not want to talk to anyone but that he, RIDLEY, talks to him five times a day. RIDLEY said that he needs to talk to BERRY about something for his brother-in-law. Based upon other investigation, I am aware that at this time BERRY was in Las Vegas, and I believe that CARL RIDLEY was acting on his behalf during his absense.

70. On June 29, 2001, at approximately 6:23 p.m. EARL BERRY called INDIVIDUAL A and asked INDIVIDUAL A, "You know those skates I bought, You need to bring me back the money for one pair." INDIVIDUAL A asked why and BERRY replied "Because dude didn't like those skates, he said they didn't fit her."

37

INDIVIDUAL A asked BERRY if he got it back to fix later and BERRY replied that he would get it back. BERRY said "I'm going to get it back because he wants rubber wheels and they them hard wheels that chip on the ground." INDIVIDUAL A asked "Okay, but keep it, right you keep it." BERRY answered "Yeah I'll keep it. I'll do something with it." Affiant believes BERRY and INDIVIDUAL A are discussing the quality of cocaine that BERRY had given to a customer and BERRY wanted to return it to INDIVIDUAL A who in turn wanted BERRY to keep it and sell it. At approximately 7:00 p.m. INDIVIDUAL A called BERRY and asked "Why you not give him the...yours and I'll give you tomorrow." BERRY asked what he was talking about and INDIVIDUAL A said "You told me your cousin need, need 3 girls, right?" (Believed to be three kilograms of cocaine) BERRY stated "Yeah, but I did something else with that." BERRY and INDIVIDUAL A agree to meet at 8:00 at the park and BERRY said "it will be me." Affiant believes BERRY was asking INDIVIDUAL A to purchase an additional three kilograms of cocaine, or "girls".

71. At approximately 10:33 p.m. INDIVIDUAL A called CARL RIDLEY and had a conversation in which INDIVIDUAL A said to RIDLEY "You remember the paint you gave me back," believed to be the cocaine discussed above. RIDLEY replied "Uh-huh." and INDIVIDUAL A stated "I take it to my brother-in-law and they work, the paint work." RIDLEY replied "That's what they told

38

me." INDIVIDUAL A stated "You got to talk to you people because
I lost right there a quarter key." Affiant understands this to
mean that INDIVIDUAL A and RIDLEY where discussing the cocaine
which was returned to INDIVIDUAL A.  INDIVIDUAL A gave the
cocaine to his brother-in -law who discovered the quantity,
believed to be a kilogram of cocaine was short.

72.  On June 30, 2001, at approximately 1:33 p.m.  BERRY and
INDIVIDUAL A had a telephone conversation in which INDIVIDUAL A
asked BERRY if he remembered what he told him last night and
BERRY replied, "Man I told you about talking crazy on the phone."
INDIVIDUAL A replied he wanted to let him know because it is not
straight.  BERRY stated " I don't know what you are talking
about, are you talking about the car he bought from you, he owes
you $1000." INDIVIDUAL A replied "Look there is $500 in one and
$400 in the other." BERRY asked if the man owes you $500 and
INDIVIDUAL A said "No $900 Cabron!" BERRY said "Well that is all
you have to say man, you don't need to talk about this and that."
 Affiant understand this conversation to be in regards to the
cocaine returned to INDIVIDUAL A which was short a quantity.
INDIVIDUAL A is telling BERRY that his guy, believed to be CARL
RIDLEY, owes him nine thousand dollars.

73.  On June 30, 2001, at approximately 7:05 p.m. EARL BERRY
called CARL RIDLEY and told him "KENNY said can you bring him a
little of that personal trip." RIDLEY said "I got you." BERRY

39

then repeated "Yeah, cause he just called and said man when you all come, tell CARLOS to bring me a little of that. You know what I'm sayin? " RIDLEY replied "Ain't no problem." Affiant understands this to mean that BERRY called RIDLEY to arrange for the delivery to "KENNY" of a small amount of narcotics.

74. On October 24, 2001, at approximately 1:16 p.m. CARL RIDLEY and INDIVIDUAL A were intercepted in a telephone conversation in a court ordered interception of INDIVIDUAL A's telephones. RIDLEY told INDIVIDUAL A he "I try to stay committed to one person so you got to look out for me. Don't try to jack up the mother fucking prices to damn high." RIDLEY further stated that SUGAR (EARL BERRY) was still "moving." INDIVIDUAL A stated the SUGAR needs to work for him because he owes him money, Affiant believes INDIVIDUAL A is referring to the five kilograms seized from BERRY in which BERRY was fronted a portion of that quantity. INDIVIDUAL A voiced concern to RIDLEY that if SUGAR is working for someone else he wouldn't pay INDIVIDUAL A his money. RIDLEY replied that he unlike SUGAR waits for INDIVIDUAL A so he should get better prices. INDIVIDUAL A replied that he gives the best price he can and "I don't give nobody prices like you" telling RIDLEY that he charges SUGAR more to try and get his money. RIDLEY told INDIVIDUAL A to let him make some money too and that "I should get a good price like you all, where the women come from, the women are cheap down there," believed to be code

40

for the kilogram of cocaine labeled with photographs of women matching the cocaine seized from EARL BERRY on July 30, 2001. INDIVIDUAL A asked "so you got ready the papers for my cousin?" RIDLEY stated he did and INDIVIDUAL A set up a meeting to get the papers, believed to be money.

### DONALD EARL

75.   In summary, DONALD EARL was intercepted in incriminating calls with EARL BERRY.  Some of those conversations are summarized below.  From these calls, it appears that EARL is a co-conspirator in EARL BERRY's drug distribution network and is supplied narcotics from EARL BERRY.  EARL then distributes cocaine to his network of customers.  It appears that BERRY "fronts", or provides on credit, cocaine to EARL.  The following is a summary of the pertinent criminal calls involving DONALD EARL and EARL BERRY

76.   On April 9, 2001, at approximately 5:59 p.m. DONALD EARL was overheard on a court ordered interception of the telephone used by HUGH ROGERS.  In the call EARL told ROGERS "How long are you gonna be?  I'm back here now."  ROGERS responded "Okay are you ready to take it?" (Believed to mean ROGERS asking if he was ready to purchase cocaine)  EARL then told ROGERS "That "SWEET NIGGER" (EARL BERRY aka SUGAR) is on his way."  At approximately 6:33 p.m.  ROGERS called EARL back and asked "You

41

still waiting right? I was gonna go like, like, like maybe halfway up there." (Believed to mean half a kilogram of cocaine) ROGERS then asked if EARL can come pick him up since they were both waiting for EARL BERRY. DONALD EARL then told ROGERS that BERRY was right there with him and he put BERRY on the telephone. BERRY told ROGERS "That's why I told you, let me go over here first. That's where I was going." ROGERS then told BERRY "I'm at the condo." (Believed to be an apartment used by ROGERS to conduct narcotics sales) BERRY told ROGERS to give him thirty minutes and he would be over there. Affiant understands this conversation to be in regards to DONALD EARL and ROGERS discussing the purchase of cocaine from EARL BERRY who then told ROGERS that he was on his way over to his apartment to complete the narcotics transaction.

77. On April 10, 2001, at approximately 4:20 p.m. EARL called ROGERS and asked "How was that fitted." ROGERS responded "Lovely" then EARL asked "remember that other suit, before this, before you went and got the other suit made? Hey, was that slimy?" ROGERS responded "Hell yeah" and EARL asked "But it do ah, get there thought?" ROGERS told EARL "Eventually but it don't ever be like, you know." Affiant believes this conversation to mean EARL was asking ROGERS about how he cooked up the cocaine that they purchased from EARL BERRY.

78. On June 29, 2001, at approximately 1:29 p.m. (Call

#1351) DONALD EARL and EARL BERRY have a conversation in which BERRY asked EARL "you want those...you want bring a pair of K-Swiss right?" EARL responded "Yeah why don't you bring two for me." BERRY told EARL he was on his way. Affiant understands this to be code for EARL asking for a quantity of cocaine from BERRY. At approximately 3:46 p.m. EARL called BERRY and asked how long it would be. BERRY stated "My guy gonna drop over, you want some high top K-Swiss, them Nikes for the kids, right?" EARL responded that he did and BERRY said "Three pair for the kids and a pair for you. He gonna drop them off at four thirty." At approximately 5:04 p.m. BERRY called EARL to tell him he was on his way and EARL responded that he will be right there. At approximately 5:57 p.m. EARL called BERRY and asked "Does he have a bag?" and BERRY responded "Yeah, you can see through mine." Affiant understand this series of calls to be EARL ordered a quantity of cocaine in code from BERRY then completed the deal with BERRY.

79. On July 25, 2001, FBI surveillance units observed EARL BERRY meet with DONALD EARL in the vicinity of 3850 South Ellis Street in Chicago. EARL BERRY was observed driving a 1996 green Oldsmobile, Illinois registration T805771, which he drove to the parking lot located there. At approximately 1:33 p.m., (Call #110) BERRY is talking to his sister BOBBIE MOORE from 5318 South Bishop who asked for some change (Believed to be money). BERRY

43

told the MOORE that he had to meet with "POOH" (DONALD EARL) to get some money then he will come back over. At approximately 1:40 p.m. (Call #112) BERRY calls DONALD EARL and tells him he is outside. EARL exited the building and sat in the vehicle with BERRY for a short time before BERRY left the area in the green Oldsmobile and returned to the area of 5322 South Bishop.

### ROBERT PARKER

80. In summary, ROBERT PARKER was intercepted in incriminating calls with EARL BERRY. Some of those conversations are summarized below. From these calls, it appears that ROBERT PARKER is a co-conspirator in EARL BERRY's drug distribution network and is supplied narcotics from EARL BERRY. The following is a summary of the pertinent criminal calls involving ROBERT PARKER and EARL BERRY

81. On June 8, 2001, at approximately 5:26 p.m. (Call #506) ROBERT PARKER called EARL BERRY and had a conversation in which PARKER asked BERRY "Did you hook my peoples up yet?" BERRY responded "Man that dude playing games on you man. I told you I hooked him up, what yesterday, two days ago." PARKER then stated "Okay, well uh, I'll call you back too buddy. I'm about to talk to SAID in a minute. Thanks for hooking me up on that." At approximately 7:18 p.m. (Call #509) PARKER called BERRY and asked if he called. BERRY told PARKER "Naw, I called him. He said he

44

got you. He told you he got you." (Believed to mean that BERRY called SAIDRICK BERRY and he had cocaine to sell) PARKER then asked "You want me to take that over there or just wait to you get back. Cause you don't need shit to happen to this." BERRY responded "Wait til I get back." (believed to be payment previous narcotics transaction) PARKER then told BERRY thanks for the other day and discuss how he told someone "If I show you something, you can bank on it." and "I can take you to his house right now. He got..he got ..you know what I'm saying." BERRY then told PARKER that was true and he would call him back. Affiant believes that PARKER called and arranged a purchase of cocaine from BERRY for a third party. At approximately 6:34 p.m. (Call #508) PARKER called and told BERRY "your boy playing dodge ball with me. Give him a call for me. On the NEX (Nextel phone) or something." BERRY stated he would call him right now and call back. Affiant understand this series of calls to be concerning PARKER arranging to purchase cocaine from BERRY and SAIDRICK BERRY.

82. On June 12, 2001, at approximately 8:22 p.m. (Call # 715) PARKER called BERRY and said "Hey I've been over here for a God damn hour bro tryin' to chase your stupid ass brother down." BERRY asked what happened and PARKER said he was playing games. Berry then asked if PARKER was suppose to meet him over there and PARKER stated "Uh he ain't told me to meet him over there. I'm

45

tryin' to come over there and buy some and get my shit man.
That's what I'm over there for." BERRY asked "Alright, but what
I'm saying is did you talk to him anytime today and told him you
was on your way over there?" PARKER stated that he did and BERRY
told him he would call SAIDRICK and call PARKER back. Affiant
believes PARKER is attempting to purchase cocaine from SAIDRICK
BERRY and is calling EARL BERRY because he was unable to contact
SAIDRICK.

83. On June 29, 2001, at approximately 7:06 p.m. (Call#
1390) BERRY called PARKER and asked "Hey man, you gonna get my
mother fuckin' money or what Rob?" PARKER said yes and BERRY
asked when. PARKER then told BERRY "Oh I'll get it together for
you soon." Affiant believes this call to be BERRY calling to get
money from PARKER for cocaine fronted to him discussed in the
earlier call.

**Unknown Male, aka RALPH, aka RAVIO, aka DARRELL HALL**

84. In summary, RALPH Last name unknown, (LNU) was
intercepted in incriminating calls with EARL BERRY. Some of
those conversations are summarized below. From these calls, it
appears that RALPH LNU is a co-conspirator in EARL BERRY's drug
distribution network and is supplied narcotics from EARL BERRY.
RALPH LNU distributes cocaine to his network of customers
including customer out of the State of Illinois. It appears that

46

BERRY "fronts", or provides on credit, cocaine to RALPH LNU. The
following is a summary of the pertinent criminal calls involving
RALPH LNU and EARL BERRY

85.   On June 4, 2001, at approximately 5:18 p.m. (Call #212)
RALPH LNU and BERRY had a telephone conversation in which BERRY
and RALPH LNU discuss needed a "kit"  that would fit the "fifty-
seven" and that it should fit the "sixty-three Chevy too." RALPH
LNU told BERRY he would need a "kit" for a one thousand
Volkswagen" and BERRY asked if it was a yellow one (Believed to
be one kilogram of cocaine).   RALPH LNU responded yes and BERRY
told him he had one that would fit a Vega and he can look to see
if it works.  Affiant understands this to mean that BERRY was
using code to tell RALPH LNU that he had cocaine to sell.
Affiant believes that BERRY and RALPH LNU are discussing a
kilogram quantity of cocaine.

86.   On June 13, 2001, at approximately 4:51 p.m. (Call
#753) RALPH LNU called BERRY and stated that he needed to
exchange a "kit", one off a Volkswagen.  BERRY asked if they had
cracked one he could call and order another.  BERRY said he would
be back tomorrow and RALPH LNU wanted to meet with him when he
got back because he had good news for BERRY.  Affiant understands
this to mean that RALPH LNU was asking for a quantity of cocaine
in code, believed to be a kilogram, and BERRY was going to
arrange to get the narcotics for RALPH LNU and meet him later.

47

87.  On July 27, 2001, at approximately 10:45 a.m. (Call #376) RALPH LNU and BERRY had a conversation in which BERRY told RALPH that he had one white "Kit" in his S10 truck.  RALPH LNU stated he needed "a lot for the SS and the Audi."  BERRY then told RALPH LNU to call him when he was ready, meaning call when he was ready to purchase the cocaine.  Affiant believes that BERRY and RALPH LNU use the code "kit" for kilogram quantities of cocaine.

88.  On July 27, 2001, at approximately 7:23 p.m. (Call #478) BERRY called RALPH LNU and they had a telephone conversation in which RALPH LNU told BERRY he is worried about driving the car with the taillight out.  BERRY told RALPH not to worry because the car has insurance in the glove box and the car is registered out of Joliet.  Affiant believes that RALPH is using one of BERRY's car with a hidden compartment or "trap." The vehicle seized on July 30, 2001, was a brown Buick registered to INDIVIDUAL A in Joliet.  The vehicle had a trap compartment behind the rear seat.  At approximately 8:49 p.m. (Call #485) BERRY called RALPH LNU and yelled at him for not calling him back and "taking care of business."  BERRY told RALPH to call when he got there.  On July 28, 2001, at approximately 11:32 a.m. INDIVIDUAL A called EARL BERRY (Call #544) and asked BERRY if he was using the white car or if INDIVIDUAL A can use his car. BERRY informed INDIVIDUAL A that his cousin was using his car and

48

they agreed to meet later. At approximately 2:51 p.m. (Call
#571) BERRY called RALPH LNU and asked where he was at. RALPH
LNU told BERRY he had ten more miles to go until Memphis. BERRY
told RALPH "No problem I just need my car to take care of
business." RALPH said he will call when he gets there. At
approximately 10:37 p.m. (Call # 648) RALPH LNU called BERRY and
tells him he was waiting for a deposit and he has BERRY'S car.
BERRY told RALPH LNU that he wants the car back if they don't
have the right amount of money because BERRY could have used the
"Kit." RALPH told BERRY that he had "the money for the kit to
fit the SS and the Audi" but was waiting on the balance. Affiant
believes that RALPH LNU was using the vehicle with the hidden
compartments to transport cocaine and was waiting to get the rest
of the money to complete the narcotics transaction.

89. On July 30,2001, at approximately 11:13 a.m. (Call #
845) Ralph LNU called BERRY and asked "What should I do with the
deposit for the kit?" BERRY instructed RALPH to leave it in the
car and told RALPH "You straight" Affiant understands this to be
RALPH paying BERRY for the cocaine he sold in the above calls
using the trap car. Following the seizure of the five kilograms
from BERRY on July 30, 2001, RALPH LNU called BERRY at
approximately 6:01 p.m. (Call #901) BERRY answered the call and
told RALPH "I don't have the kits, it ain't going to work" then
ended the call. At approximately 6:06 p.m. (Call # 903) RALPH

49

called BERRY back and asked what BERRY was saying and BERRY
responded "Something happened to the man, I ain't got it."
Affiant believes that these calls were in reference to RALPH LNU
attempting to purchase cocaine or "kits" from EARL BERRY.

### SEARCH WARRANT LOCATIONS

**Residence and Detached Garage of Earl C. Berry**

**5322 S. Bishop, Chicago**

90.  5322 S. Bishop, Chicago, Illinois, is a two story
single family home with brown siding and brown stone on the front
of the house with a detached garage on the alley behind 5322
South Bishop.  The front entrance to the house faces Bishop
Street with the address 5322 on a metal stand in front of the
house by the sidewalk approaching the front steps.

91.  The residence and garage was repeatedly used for
the distribution of cocaine during the time of the wiretap
intercepts.  (See paragraph 57 where BERRY instructs DALLAS BYERS
to park the car in the lot and give the keys to his father at
5322 S. Bishop; see paragraph 66 where BERRY directs PHILLIP
SMITH to leave payment with his father at the 5322 S. Bishop
address; see paragraph 33 where BERRY directs WINSTON ROSS to to
to his father's house on "B.")

92.  In addition, CW-1 has been present when HUGH
ROGERS purchased cocaine from EARL BERRY at this location in the

past. CW-1 informed the FBI that EARL and SAIDRICK BERRY use
this house to sell cocaine and have used this house for years.
On numerous occasions during the Title III interception,
surveillance units have detected vehicles entering and exiting
the alley behind 5322 South Bishop and using the garage at that
location as a means of loading, unlading, and transporting
illegal drugs outside of public view.

93. On December 5, 2001 a surveillance officer at 5322 S.
Bishop observed EARL BERRY standing in front of the residence and
foot traffic in the area indicative of narcotics trafficking.

## Apartment utilized by SAIDRICK BERRY

## 5317 South Laflin, Second Floor, Chicago

94. 5317 South Laflin, Second Floor Apartment, Chicago,
Illinois, is a two flat red brick apartment building. The
address 5317 is above the door on the west side of the house
facing Laflin.

95. CW-2 conducted two controlled purchases of cocaine from
SAIDRICK BERRY at the 5317 S. Laflin apartment on July 5, and
July 23, 2001. CW-2 informed the FBI that SAIDRICK BERRY lives
in the apartment and uses this residence to distribute cocaine.
(See paragraphs 20 thru 23, concerning the controlled narcotics
purchases.)

96. On December 5, 2001, a Chicago Police Department gang
specialist, who has been so employed for 8 years, conducted a

51

surveillance at 5317 S. Laflin.  According to him, the foot
traffic in the area was indicative of continued narcotics
trafficking.

### Residence of Princess Lomax utilized by EARL BERRY
### 12331 Meadow Lane, #3 Blue Island, Illinois

97.  12331 Meadow Lane, #3, Blue Island, Illinois, is a two
story townhouse of a multi unit building with a red brick front
and tan siding.  The address 12331 Meadow Lane is on the north
side of the multi unit building with the unit number 3 above the
door to the townhouse.  The townhouse has a deck on the back with
an attached garage on the basement level on the townhouse.  A
check of public records indicate Princess Lomax is listed as the
owner and resident of the unit.

98.  The telephone utilized by EARL BERRY during the court
ordered interceptions of his telephone were subscribed to
PRINCESS LOMAX.  A total of five telephones were subscribed to
PRINCESS LOMAX at this residence.  CW-1 advised that PRINCESS
LOMAX is EARL BERRY'S girlfriend and has been his girlfriend for
a few years.

99.  On numerous occasions on surveillance during the Title
III interception, EARL BERRY  was observed at the townhouse.  On
July 26, 2001, at approximately 12:45 p.m. EARL BERRY and
INDIVIDUAL A were observed by FBI surveillance units meeting in
Sherman Park located in the area of 55th and Loomis Avenue in

Chicago. BERRY was observed in a white Chevrolet Illinois registration T766025 and INDIVIDUAL A was observed driving a brown Buick with license plates Y343404. ( The same vehicle used in paragraphs 23-26, where five kilograms were seized from EARL BERRY driving the brown Buick with a hidden compartment or trap.) BERRY is observed handing INDIVIDUAL A a black duffle bag during this meeting. At approximately 2:30 p.m. the white Chevrolet, T766025, is observed parked near 12331 Meadow Lane, Blue Island. At approximately 2:35 p.m. the brown Buick, Y343404, is observed exiting the attached garage to 12331 Meadow Lane, Apartment 3. Affiant believes BERRY and INDIVIDUAL A met at the 12331 Meadow Lane townhouse and utilized the garage there to conduct their narcotics transaction out of the public view.

## CONCLUSION

On the basis of the facts and circumstances detailed above, I believe there is probable cause to believe that from in or about January 2000 to the present, EARL C. BERRY, aka "SUGAR"; SAIDRICK BERRY; WINSTON ROSS; EDDIE FREEMAN; BRIDGETTE MAURY; DALLAS BYERS; DONALD EARL; SHERROD MAURY; PHILLIP SMITH; CARL RIDLEY; NATHAN ALEXANDER; ROBERT PARKER, RALPH Last Name Unknown, aka DARRELL HALL, aka RAVIO, knowingly and intentionally conspired with each other and with others to possess with intent to distribute numerous

53

quantities of powder cocaine and "crack cocaine" in violation of Title 21, United States Code, Section 841 and 846.

FURTHER YOUR AFFIANT SAYETH NOT

Michael J. Culloton, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
this _11_ day of _Dec_ , 2001

Magistrate Judge, United States District Court
Northern District of Illinois

54